# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

RALPH K. AKRIDGE,        )
                          )
        **Plaintiff,**      )
                          )     **Civil Action No. 3:02-0552**
**v.**                   )     **Judge Nixon / Knowles**
                          )
JO ANNE BARNHART,      )
**Commissioner of Social Security**   )
                          )
        **Defendant.**     )

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff was not disabled and denying Plaintiff Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), as provided under the Social Security Act ("the Act"), as amended. The case is currently pending on cross-Motions for Judgment on the Administrative Record.[1] Docket Entry Nos. 22 and 25.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED and Defendant's Motion for Judgment on the Administrative Record be GRANTED.

---

[1] Plaintiff did not file a Motion, but filed "Plaintiff's Brief in Support of Plaintiff's Motion for Summary Judgment," which the court will construe as Plaintiff's Motion for Judgment on the Administrative Record.

1

## I.  INTRODUCTION

Plaintiff filed his applications for DIB and SSI[2] on December 1, 1999, alleging that he had been disabled since September 27, 1999, due to asthma, degenerative bone disease (spinal), spinal bone spurs, sciatica, acute pancreatitis, and kidney problems.  Docket Number 14, Attachment ("TR"), TR 67-69, 77.  Plaintiff's applications were denied both initially (TR 36-38; 41-45) and upon reconsideration (TR 39-40; 604-605).  Plaintiff subsequently requested (TR 50) and received (TR 606-628) a hearing.  Plaintiff's hearing was conducted on November 30, 2001, by Administrative Law Judge ("ALJ") Robert C. Haynes.  TR 606-628.  Plaintiff's wife, Ms. Cathy Akridge, and Vocational Expert ("VE"), Dr. Gordon Doss, appeared and testified.[3]  *Id.*

On January 23, 2002, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations.  TR 12-29.  Specifically, the ALJ made the following findings of fact:

> 1. The claimant met the insured status requirements of the Act as of the alleged onset date.
>
> 2. The claimant has not engaged in substantial gainful activity since the alleged onset date.
>
> 3. The claimant has "severe" impairments, including degenerative disc disease of the lumbar spine, status post multiple back surgeries, aortic valve regurgitation, and an adjustment disorder with depressed mood.
>
> 4. The claimant's impairments, considered individually and in

---

[2] Plaintiff's actual application for SSI is not contained in the record before the Court, but is referenced in the ALJ's decision.  *See, e.g.,* TR 12.  There is, however, an "SSI Query dated [June 2, 2001] in lieu of Application," located in the record.  TR 4; 595-596.

[3] Plaintiff appeared, but was unable to testify at his hearing because of medical problems. *See* TR 608-609.

Case 3:02-cv-00552   Document 29   Filed 04/17/06   Page 2 of 60 PageID #: 5

combination, do not meet or equal in severity any impairment set forth at 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.   The claimant's allegations of pain and functional limitations are not credible.

6.   The claimant retains the residual functional capacity for occasional lifting of up to 20 pounds, 10 pounds frequently, with sitting, standing/walking for about 6 hours of an 8 hour workday, with no more than occasional climbing, balancing, stooping, kneeling, crouching, and crawling, and taking into consideration moderate limitations in the following areas: ability to carry out detailed instructions; ability to maintain attention and concentration for extended periods; ability to work in coordination with or proximity to others without being distracted by them; ability to respond appropriately to changes in the work setting; ability to interact appropriately with the general public; ability to accept instructions and respond appropriately to criticism from supervisors; and ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.

7.   The claimant cannot perform any past relevant work.

8.   The claimant is a younger individual.[4]

9.   The claimant has a high school education.

10.  The transferability of any acquired work skills is not a material issue.

11.  The framework of Rule 202.22 of the Medical-Vocational Guidelines and vocational expert testimony demonstrate that the claimant has the residual functional capacity to perform jobs that exist in significant numbers in the national economy.

---

[4] Plaintiff's medical records show his date of birth as "11/12/59," making him 42 years old at the time of the hearing.

3

12.     The claimant is not disabled within the meaning of the Act.

TR 28-29 (footnote added).

On February 19, 2002, Plaintiff timely filed a request for review of the hearing decision. TR 7. On April 12, 2002, the Appeals Council issued a letter declining to review the case (TR 5-6), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. §§ 405(g) and 1383(c)(3). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II. REVIEW OF THE RECORD

### A. Medical Evidence

Plaintiff alleges disability due to asthma, degenerative bone disease (spinal), spinal bone spurs, sciatica, acute pancreatitis, and kidney problems. TR 77.

On January 5, 1984, Dr. Cooper Beazley reported that Plaintiff's back problems had begun around November 28, 1983. TR 401. Dr. Beazley examined Plaintiff. *Id.* Dr. Beazley's examination revealed that Plaintiff had a ruptured lumbar disc. *Id.* Dr. Beazley prescribed Naprosyn, Celestone, and Synalgas. *Id.*

On January 23, 1984, Dr. Beazley examined Plaintiff and noted that Plaintiff "almost certainly" had a "ruptured lumbar disc." TR 401. Dr. Beazley noted that Plaintiff should remain home from work for 3 weeks. *Id.* Dr. Beazley ordered Plaintiff 1 milligram of "IV Colchicine" which was to be administered in the Emergency Room. *Id.* Dr. Beazley noted that Plaintiff was also to be "placed on .6 milligrams twice a day for two weeks," and continue taking Naprosyn. *Id.*

4

On February 6, 1984, Dr. Beazley examined Plaintiff and reported that Plaintiff had "a dramatic response" to the "IV colchicine." TR 401. Dr. Beazley noted that Plaintiff reported that his pain had become "much better" within 24 hours of receiving the "IV colchicine." *Id.* Dr. Beazley allowed Plaintiff to return to work on February 14, 1984. *Id.*

On March 2, 1984, Dr. Beazley examined Plaintiff and noted that Plaintiff had "re-hurt" his back and was to "get back on the Naprosyn." TR 401.

On September 14, 1992, Dr. Beazley examined Plaintiff for complaints of an "[i]njury to his back" as a result of an injury earlier that week.[5] TR 396. Dr. Beazley's impression was "[l]umbar strain, which [was] fairly acute in nature." *Id.*

On September 28, 1992, Dr. Beazley saw Plaintiff for a follow-up examination on his lumbar strain. TR 395. Dr. Beazley noted that Plaintiff's "straight leg raising [was] negative" and that his "ROM" was "about 70% of normal." *Id.* Dr. Beazley's impression was "[i]mproving lumbar strain." *Id.*

On October 19, 1992, Plaintiff returned to Dr. Beazley for another follow-up examination regarding his lumbar strain. TR 395. Dr. Beazley noted that Plaintiff's "ROM of the back" was "normal" and that his neurologic examination was "intact in the lower extremities." *Id.* Dr. Beazley's impression was "[r]esolved lumbar strain." *Id.*

On February 12, 1993, Dr. Beazley examined Plaintiff for complaints of "[r]ecurrent back and left leg pain." TR 394. Dr. Beazley's impression was "[r]ecurrent lumbar strain, left sciatica." *Id.*

_____

[5] The record also contains treatment records from Dr. Beazley for the period from August 1, 1984 through September 26, 1990, that concern an injury to Plaintiff's wrist. TR 397-400.

On February 26, 1993, Plaintiff again returned to Dr. Beazley for a follow-up examination of his lumbar strain. TR 394. Dr. Beazley noted that Plaintiff was "doing a little better," that his pain was "improved," and that he had continued to go to work. *Id.* Dr. Beazley noted that Plaintiff's "[s]traight leg raising [was] moderately positive at full extension," and that Plaintiff's "[s]ensory, motor and reflexes [were] within normal limits." *Id.* Dr. Beazley's diagnostic impression was "[r]esolving lumbar strain." *Id.*

On December 7, 1995, Dr. Joe E. Beavers examined Plaintiff for complaints of "pain in the low back radiating down to the right leg." TR 392. Dr. Beavers's impression was "[o]steoarthritis, mild grade, into the lumbar spine, right leg sciatica." *Id.* Dr. Beavers placed Plaintiff on a "Prednisone Dosepak," on "Soma for muscle relaxants," and on "Co-Gesic for pain." *Id.*

On December 29, 1995, Dr. Beavers examined Plaintiff for complaints of "[s]lowly resolving right leg pain with low back pain" and "pain in the left elbow." TR 391. Dr. Beavers' impression was "[l]ateral epicondylitis of the left elbow with slowly resolving sciatica in the right leg." *Id.* Dr. Beavers prescribed Darvocet N-100 and ordered an MRI of Plaintiff's back. *Id.*

On January 12, 1996, Dr. Beavers examined Plaintiff for complaints of "[l]umbar pain, unresolved with conservative treatment" and "left lateral elbow pain, epicondylar pain." TR 390. Dr. Beavers' impression was "[l]ateral epiconylitis, unresolved and also lumbar pain with right leg sciatica." *Id.*

On January 16, 1996, Plaintiff underwent an MRI of his lumbar spine which revealed that Plaintiff had "[m]ultiple level lumbar degenerative disc changes with suggested small central

6

HNP L5-S1 and likely subligamentous HNP." TR 388.

On January 23, 1996, Dr. Beavers examined Plaintiff for complaints of low back pain. TR 390. Dr. Beavers' impression was "[l]ow back pain with HNP at L5-S1 and also degenerative changes between L3-L4 and L4-L5." *Id.*

On June 27, 1997, Dr. Joseph W. Miles, Jr. examined Plaintiff for complaints of "left flank discomfort." TR 124. Plaintiff had brought Dr. Miles "a few calculi" that he had recently passed, which Dr. Miles submitted for a stone analysis. *Id.* Dr. Miles' impression of Plaintiff was "[l]eft flank discomfort - probable left ureteral calculus"; "[r]ight ureteral obstruction - mild to moderate - probably a right ureteral calculus"; and "[r]ecent spontaneous passage of several ureteral calculi." *Id.*

On June 30, 1997, Plaintiff underwent an ultrasound of his kidneys. TR. 123. On July 1, 1997, Dr. Miles reviewed the results of the ultrasound and commented that Plaintiff's symptoms had "improved." *Id.* Dr. Miles noted that there was no "CVA tenderness" and that Plaintiff was to "continue with his antibiotics." *Id.*

On July 9, 1997, Dr. Miles noted that the "stone analysis" of Plaintiff's calculi revealed that the fragments appeared to be "a drug." TR 123. On July 10, 1997, Dr. Miles noted that Plaintiff requested a "few more pain pills," and that he gave Plaintiff Mepergan Fortis. *Id.*

On July 21, 1997, Plaintiff telephoned Dr. Miles requesting more pain medication. TR 123. Dr. Miles prescribed Lortab 5. *Id.*

On July 25, 1997, Dr. Miles examined Plaintiff for complaints of "occasional right back discomfort." TR 122. Dr. Miles noted that Plaintiff had right "CVA tenderness." *Id.* Dr. Miles recommended that Plaintiff "undergo cystoscopy, retrograde pyelograms, etc," and noted that he

gave Plaintiff a prescription for Lortab 5. *Id.*

On August 6, 1997, Plaintiff telephoned Dr. Miles and stated that he was experiencing "discomfort." TR 122. Dr. Miles prescribed Lortab 5 to Plaintiff. *Id.*

On August 13, 1997, Dr. Miles examined Plaintiff and noted "high-trade obstruction, right ureter." TR 122. Dr. Miles also noted that Plaintiff underwent the recommended cystoscopy. *Id.*

On August 18, 1997, Dr. Miles examined Plaintiff and noted that Plaintiff was given Lortab 5 and that Plaintiff was to continue with his Trimpex. TR 122.

On August 25, 1997, Dr. Miles examined Plaintiff and noted that Plaintiff was given Lortab 5 and that Plaintiff was to make arrangements for "cystoscopy and stent removal." TR 122.

On August 27, 1997, Dr. Miles examined Plaintiff and noted that the "indwelling right ureteral stent was removed intact without difficulty." TR 121. Dr. Miles stated that Plaintiff was to "continue with the antibiotics that he [had] at home." *Id.*

On August 28, 1997, Plaintiff telephoned Dr. Miles and stated that he was experiencing "some discomfort and some chills." TR 121. Dr. Miles noted that Plaintiff was given a prescription for Mepergan Fortis and that samples of Floxin were left at the office front desk for Plaintiff's wife to pick up that day. *Id.*

On September 2, 1997, another "stone analysis" revealed that Plaintiff's stones were "96% ephedrine metabolite or analog" and "4% protein." TR 121. On September 15, 1997, Plaintiff was given the results of the "stone analysis" and stated that he had been taking "Mini-TwoWay Tablets." *Id.* Dr. Miles noted that these tablets contained "25 mg of ephedrine HCL."

8

*Id.* Dr. Miles reported that Plaintiff stated that he had been taking "up to 25 of the tablets per day, 7 days a week," but that he had "discontinued this medication." *Id.* Dr. Miles noted that Plaintiff was placed on Trimpex and given a prescription for Lortab 5. *Id.*

On September 18, 1997, Dr. Miles examined Plaintiff for complaints of "right flank discomfort." TR 120. Dr. Miles noted that Plaintiff had "right CVA tenderness" and that Plaintiff was given samples of Cipro. *Id.*

On September 19, 1997, Dr. Miles examined Plaintiff and prescribed Cipro and Lortab 5, and noted that Plaintiff was to "go back on Trimpex" after finishing the Cipro. TR 120.

On September 24, 1997, Plaintiff telephoned Dr. Miles and stated that he had experienced "some right flank discomfort." TR 120. Dr. Miles noted that Plaintiff was given Lortab 5. *Id.*

On September 29, 1997, Dr. Miles examined Plaintiff and noted that Plaintiff had been experiencing "right flank discomfort." TR 119. Plaintiff underwent an ultrasound of his right kidney which revealed "no evidence of hydronephrosis or renal mass." *Id.* Dr. Miles' impression was "[p]robable spontaneous passage of ureteral calculus." *Id.* Dr. Miles noted that Plaintiff was given Lortab 5. *Id.*

On October 20, 1997, Dr. Miles examined Plaintiff and noted that Plaintiff did not have "CVA tenderness." TR 119. Dr. Miles noted that a "U/A" revealed no presence of "microscopic hematuria" and that Plaintiff's nitrites were "negative." *Id.* Dr. Miles noted that Plaintiff was given Lortab 5.[6] *Id.*

---

[6] Dr. Miles' records also indicate that, in October 1997, Plaintiff obtained Lortab 5 on three occasions, from Kroger Pharmacy. TR 119.

On November 12, 1997, Dr. Miles examined Plaintiff and noted that Plaintiff complained of "right flank discomfort" and that Plaintiff had "passed some calculi or debris earlier in the week." TR 119. Dr. Miles noted that a "U/A" revealed no presence of "microscopic hematuria" and that Plaintiff's nitrates were "negative." *Id.* An ultrasound of Plaintiff's kidney revealed "[n]o evidence of hydronephrosis, renal mass, or posterior shadowing." *Id.* Dr. Miles prescribed Mepergan Fortis and Trimpex.[7] *Id.*

On January 8, 1998, Dr. Miles reported the results of a "stone analysis" which revealed that Plaintiff's stones contained "95% ephedrine" and "5% protein." TR 118.

Dr. Miles noted that Plaintiff received Lortab 5 in January, February, and March 1998. TR 118. On March 25, 1998, Dr. Miles noted that he told Plaintiff that he would not "call in any more pain medication" until Plaintiff visited him for an appointment. *Id.*

On April 24, 1998, Plaintiff telephoned Dr. Miles and stated that he was experiencing "pain and frequency." TR 117. The records report that Plaintiff was instructed to see his "family physician" or go the Emergency Room. *Id.*

On June 16, 1998, Dr. Miles noted that Plaintiff had reported experiencing "right back discomfort for approximately one week" and "some nausea for approximately two days." TR 117. Plaintiff underwent an ultrasound of his right kidney which revealed "[n]o posterior shadowing [was] demonstrated"; "[n]o evidence of hydronephrosis"; and "[n]o renal masses [were] demonstrated." *Id.* Dr. Miles noted that Plaintiff was given Mepergan Fortis and Cipro,

---

[7] Dr. Miles records also indicate that Plaintiff received Lortab 5 on two occasions in December 1997, and on two occasions in January 1998. TR 118.

and that Plaintiff stated that he had not taken "Mini-Thins"[8] in approximately 7 weeks.  *Id.*  Dr. Miles noted that Plaintiff had a "past history of calculi composed of ephedrine."  *Id.*

On June 20, 1998, Dr. Miles noted that Plaintiff had undergone an "IVP" which revealed "prompt function bilaterally with no evidence of ureteral obstruction" and no evidence of "renal calculi."  TR 117.  On July 1, 1998, Dr. Miles noted that Plaintiff received Lortab 5.  *Id.*

On July 14, 1998, Plaintiff underwent a cystoscopy, left retrograde pyelogram, and stone manipulation.  TR 117.  Dr. Miles noted that there was "no stone recovered."  *Id.*

On July 20, 1998, Plaintiff telephoned Dr. Miles stating that he was "experiencing hematuria" and that the Mepergan Fortis was "too strong" for him.  TR 116.  Dr. Miles noted that Plaintiff was given Lortab 5.  *Id.*

On July 22, 1998, Dr. Miles noted that Plaintiff had "completed Cipro and [was] now on Trimpex."  TR 116.  Dr. Miles prescribed Mepergan Fortis.  *Id.*

On July 23, 1998, a "stone analysis" revealed that Plaintiff's stones contained "95% ephedrine metabolite or analog" and "5% protein."  TR 116.

On July 29, 1998, Dr. Miles noted that Plaintiff's "left ureteral stent was removed intact without difficulty."  TR 116.  Dr. Miles also noted that Plaintiff was to continue with Trimpex and that he was given a prescription for Lortab 5.  *Id.*

On August 5, 1998, Dr. Miles reported that he had had a conversation with Dr. Peterson which revealed that Plaintiff had undergone a cystoscopy that weekend and had been discharged from the hospital on August 2, 1998.  TR 116.

On August 7, 1998, Dr. Miles examined Plaintiff for complaints of "some left flank

---

[8] "Mini-Thins" are also referred to as "Mini-TwoWay Tablets."  *See* TR 14; 121.

11

discomfort." TR 115. Plaintiff underwent an ultrasound of his left kidney which revealed "no evidence of hydronephrosis, no posterior shadowing [was] demonstrated." *Id.* Dr. Miles noted that Plaintiff was "instructed not to take anymore [*sic*] Mini-Thins," and that Plaintiff was prescribed Lortab 5. *Id.*

On August 20, 1998, Plaintiff underwent a cystoscopy and was released the next day. TR 114. Dr. Miles noted that Plaintiff was to take "allopurinol 300 mg daily," and Urocit-K. *Id.*

On August 24, 1998, Dr. Miles noted that Plaintiff was seen in the Emergency Room the previous day because of "flank pain."[9] TR 114. Dr. Miles noted that Plaintiff received a prescription for Lortab 5. *Id.*

On August 31, 1998, Dr. Miles noted that he would discuss Plaintiff's condition with Dr. Saleh to see if there was "any way to rid [Plaintiff] of his ephedrine." TR 114. Dr. Miles reported that Plaintiff had recently had an "IVP performed through the ER" and that, "by history," it was "interpreted as being WNL." *Id.*

On September 1, 1998, Dr. Miles noted that Plaintiff's August 28, 1998 "IVP" revealed "a calcific density in the mid and lower portion of [Plaintiff's] right kidney," and that Plaintiff's August 30, 1998 "IVP" revealed that no "renal calculi" were seen; that there was "prompt function bilaterally with no evidence of ureteral obstruction"; and that there was a "[p]ossible ureteritis cystica demonstrated in the upper third of the left ureter." TR 113.

On September 2, 1998, Dr. Miles noted that Plaintiff received Mepergan Fortis. TR 113. On September 9, 1998, Dr. Miles noted that Plaintiff received Lortab 5. *Id.*

On September 14, 1998, Dr. Miles examined Plaintiff and noted that Plaintiff complained

---

[9] The record does not indicate which "Emergency Room" was involved.

of "some right flank discomfort." TR 113. Dr. Miles noted that a "U/A" revealed "[l]arge amount of blood demonstrated chemically." *Id.* Dr. Miles noted that Plaintiff received Lortab 5. *Id.*

On September 24 and 29, 1998, Dr. Miles noted that Plaintiff was given Lortab 5. TR 115. Dr. Miles further reported that Plaintiff was told that Dr. Miles would not "call in any more pain medication." *Id.*

On October 8, 1998, Plaintiff was told that Dr. Miles would not "call in any more pain medication for him until he had been evaluated by a PCP." TR 115. Dr. Miles noted that Plaintiff stated that he had an appointment to see his "PCP" the next day. *Id.*

On November 10, 1998, Dr. Miles examined Plaintiff for complaints of "right flank discomfort" and "some nausea of two weeks duration." TR 112. Dr. Miles noted that there was "no CVA tenderness," and that an ultrasound of Plaintiff's right kidney revealed "no evidence of posterior shadowing, hydronephrosis, or renal mass." *Id.* Dr. Miles noted that a "U/A" revealed no presence of "microscopic hematuria," and that "nitrates" were "negative." *Id.* Dr. Miles noted that Plaintiff was given Lortab 5. *Id.*

On November 12, 1998, Plaintiff telephoned Dr. Miles requesting "stronger pain medication," but was told that Dr. Miles could not give him stronger medication. TR 112.

On November 15, 1998, Dr. Miles noted that Plaintiff had been seen in the Emergency Room for complaints of "right flank discomfort." TR 112.

On November 25, 1998, Dr. Miles examined Plaintiff and noted that Plaintiff stated that he had not been taking "Urocit-K," but that he had been taking allopurinol. TR 112. Dr. Miles noted that Plaintiff complained of "right flank discomfort," and that Plaintiff underwent an

13

ultrasound of his right kidney, which revealed "no evidence of posterior shadowing, hydronephrosis, or renal mass." *Id.* Dr. Miles prescribed Tylox. *Id.*

On December 16, 1998, Dr. Miles examined Plaintiff and noted that Plaintiff continued to "experience hematuria," and that Plaintiff complained of "right flank discomfort." TR 111. Dr. Miles noted that he "discussed cystoscopy, retrograde pyelograms, [and] possible ureteroscopy" with Plaintiff. *Id.* Dr. Miles reported that he would consider ordering a CT scan of Plaintiff's kidneys, with and without "contrast materia." *Id.* Dr. Miles noted that Plaintiff was given Lortab 5. *Id.*

On December 21, 1998, Plaintiff telephoned Dr. Miles stating that his condition had not improved. TR 111. On December 23, 1998, Dr. Miles noted that Plaintiff was told that he would not receive any more prescriptions for pain medication unless he underwent a cystoscopy scheduled for January 6, 1999. *Id.* Dr. Miles noted that Plaintiff was given Tylox. *Id.* On January 6, 1999, Plaintiff underwent a cystoscopy, bilateral retrograde pyelograms, and right ureteroscopy. *Id.*

On January 15, 1999, Plaintiff stated that he had recently passed some "drug material." TR 110. Dr. Miles noted that Plaintiff had been seen in the Emergency Room on January 13, 1998 for "renal colic." *Id.* Dr. Miles prescribed Tylox. *Id.*

On January 26, 1999, Plaintiff presented to Clarksville Memorial Hospital Emergency Room, complaining of right "flank pain" for which he was given a "Tylox 6-pack." TR 338-339.

On January 28, 1999, Dr. Miles examined Plaintiff for complaints of "right back discomfort," and noted that Plaintiff had been seen in the Emergency Room the previous

14

Wednesday night.  TR 110.  Dr. Miles prescribed Darvocet N-100.[10]  *Id.*

On February 8, 1999, Dr. Robert B. Parker examined Plaintiff and noted that Plaintiff had "chronic back pain."  TR 149.  Dr. Parker noted Plaintiff's problem with kidney stones, and he reported that Plaintiff's knees had swelled the previous weekend such that he "could hardly walk."  TR 147.

On March 2, 1999, Dr. Miles examined Plaintiff for complaints of "right flank discomfort and dysuria."  TR 109.  Dr. Miles noted that Plaintiff was given samples of Floxin and prescribed Tylox.  *Id.*

On March 15, 1999, Dr. Miles noted that Plaintiff had missed his last 3 appointments for his "IVP," and that Plaintiff had telephoned him requesting analgesics.  TR 108.  Dr. Miles reported that he told Plaintiff that he would not give him the analgesics until he underwent the suggested urological evaluation.  *Id.*

On April 5, 1999, Plaintiff presented to Clarksville Memorial Hospital complaining of kidney pain.  TR 333.  The physician noted the presence of "mild distress" and "mild depression," and further noted that Plaintiff was "uncomfortable."  *Id.*

On April 6, 1999, Plaintiff underwent an "IVP," which revealed that there were "no renal calculi demonstrated" and there was "prompt function bilaterally with no evidence of ureteral obstruction."  TR 108.

On April 9, 1999, Plaintiff telephoned Dr. Miles requesting Lortab and stated that the Darvocet was not working.  TR 108.  Dr. Miles noted that he did not "call in" the medication as

---

[10] The records also indicate that Dr. Miles prescribed Plaintiff additional Darvocet N-100 on 4 separate occasions in February 1999.  TR 109.

15

requested by Plaintiff. *Id.*

On April 23, 1999, Dr. Miles examined Plaintiff and reported that Plaintiff had stated that he had been "laid off from his job - because had missed so much work." TR 107. Dr. Miles noted that Plaintiff was scheduled to have a CT scan of his kidneys and that Plaintiff was given Darvocet N-100. *Id.*

On May 6, 1999, Dr. Parker examined Plaintiff for complaints of an "injured back." TR 143. Dr. Parker noted that it was "uncomfortable" for Plaintiff to sit or walk. *Id.* Dr. Parker prescribed Lortab.[11] TR 144.

On May 14, 1999, Plaintiff visited Dr. Beazley, complaining of "[l]ow back and recurrent right leg pain." TR 387. Dr. Beazley's impression was "[l]umbar arthritis with some associated right sciatic symptoms." *Id.* Dr. Beazley placed Plaintiff on a Medrol Dosepak, stated that he would follow it with Relafen, and gave Plaintiff Flexeril and Darvocet N-100.[12] *Id.*

On May 25, 1999, Plaintiff was given Lortab 5. TR 106. Dr. Miles noted that he told Plaintiff that he "would not give him any more analgesics," and that Plaintiff was to call his "PCP" for this request. *Id.*

On May 28, 1999, Plaintiff visited Dr. Beazley for a follow-up examination. TR 387. Dr. Beazley's impression of Plaintiff was "[p]ersistent pain." *Id.* Dr. Beazley noted that Plaintiff's prescriptions for Flexeril and Darvocet had been renewed and that Plaintiff would consider undergoing an "epidural injection." *Id.*

---

[11] Dr. Miles records indicate that Plaintiff received Lortab 5 on May 11, 1999. TR 107.

[12] Dr. Miles records also indicate that Plaintiff received Darvocet N-100 on May 20, 1999. TR 107.

16

On June 7, 1999, Dr. Miles examined Plaintiff and reviewed the results of a "twenty-four-hour urine for metabolic stone work-up." TR 106. Dr. Miles noted the presence of abnormalities which included "hypercalciuria, elevated urinary sodium, and hyperuricosuria." *Id.* Dr. Miles opined that Plaintiff had "absorptive hypercalciuria type I," and he placed Plaintiff on a specific diet. *Id.*

On June 16, 1999, Plaintiff telephoned Dr. Miles and requested pain medication. TR 106. Dr. Miles told Plaintiff to contact his "PCP." *Id.*

On June 28, 1999, Plaintiff visited Dr. Parker, complaining that he had experienced "elbow pain" over the past month. TR 141. Dr. Parker prescribed Naprosyn, Darvocet N-100, and Lortab 5. TR 142.

On July 12, 1999, Plaintiff returned to Dr. Beazley's office for a follow-up examination regarding his lumbar arthritis. TR 386. Dr. Beazley noted that Plaintiff had a "positive straight leg raise on the right at 45°, negative on the left," and that he was "otherwise neurologically unchanged." *Id.* Dr. Beazley's impression was "recurrent right sciatica." *Id.* Plaintiff was placed on a "Dosepak" and "some Relafen." *Id.*

On July 15, 1999, Plaintiff visited Dr. Parker, again complaining of pain in his right elbow. TR 139. Dr. Parker noted that Plaintiff described the pain as "throbbing" and as being on the "outside of [the] elbow." *Id.* Dr. Parker noted that Plaintiff had not worked that day because of pain. *Id.*

On July 16, 1999, Plaintiff telephoned Dr. Parker stating that he had been "called into work even though Dr. Parker recommended resting his elbow." TR 137. Dr. Parker prescribed Darvocet N-100. *Id.*

On July 22, 1999, Plaintiff telephoned Dr. Parker complaining of "[right] elbow pain." TR 137. Dr. Parker told Plaintiff that he could not have another injection for 3 months and that he should have rested his elbow as directed. *Id.*

On July 30, 1999, Dr. Miles noted that Plaintiff had been seen in the Emergency Room the previous night for "flank discomfort."[13] TR 106. Dr. Miles further noted that he gave Plaintiff Lortab 5. *Id.*

On July 30, 1999, Dr. Stephen Kent examined Plaintiff for complaints of "right flank pain that radiates into his right testicle." TR 319-320. Dr. Kent's impressions were "[r]ight flank pain with hematuria, etiology undetermined" and "[h]istory of ephedrine stones." TR 320. Dr. Kent also noted that Plaintiff "was offered to see Dr. Parker later [that day] or to have an IVP" performed. *Id.* Plaintiff was noted to have refused both offers, stating that he would "just go home and suffer." *Id.*

On August 2, 1999, Plaintiff visited Dr. Beazley's office for a follow-up examination regarding his right sciatica. TR 386. Dr. Beazley noted that Plaintiff stated that he would try to make financial arrangements to undergo an epidural. *Id.* Plaintiff's examination revealed that he had a "positive straight leg raise of about 45 degrees on the right." *Id.* Dr. Beazley gave Plaintiff Lortab 7.5. *Id.*

On October 25, 1999, Dr. Beazley examined Plaintiff for complaints of "[r]ecurrent right sciatica." TR 385. Dr. Beazley noted that Plaintiff reported that he had begun to have recurrent problems when he sneezed while bending over, which caused "immediate pain." *Id.* Dr. Beazley noted that Plaintiff had been recently hospitalized for pancreatitis, and that Plaintiff was

---

[13] The record does not indicate which Emergency Room was involved.

sore in the "low back about the SI regions bilaterally." *Id.* Dr. Beazley noted that Plaintiff had a "positive straight leg raise at about forty five [*sic*] degrees and negative on the left." *Id.* Dr. Beazley gave Plaintiff a Medrol Dosepack, Tylox, and Robaxin. *Id.*

On November 5, 1999, Plaintiff visited Dr. Beazley's office. TR 384. Nurse Practitioner, Ms. Kitty Stephens, noted that Plaintiff was "[u]nchanged from his previous visit." *Id.* Nurse Stephens noted that Plaintiff should pursue a "lumbar epidural injection," and opined that narcotic medicine would not be a long-term option for Plaintiff. *Id.* Plaintiff was given Tylox. *Id.*

On November 17, 1999, Plaintiff returned to Dr. Beazley's office for a follow-up examination. TR 384. Nurse Stephens' impression was: "[p]ersistent pain, a possible disc rupture." *Id.* She noted that Plainitff was given Tylox and Robaxin, and that Plaintiff would try samples of Vioxx. *Id.*

On November 19, 1999, Dr. Beazley ordered an MRI scan of Plaintiff's lumbar spine. TR 383. Nurse Stephens noted that Plaintiff received Tylox and "some additional Vioxx 25 mg [*sic*] samples." *Id.*

On December 1, 1999, Dr. Stephen H. Percelay reviewed the MRI reading ordered by Dr. Beazley. TR 289-290. His impressions were: "[l]arge central disc herniation/protrusion with extruded fragment at L5-S1"; "[r]ight paracentral disc bulging/protrusion at L4-L5 without evidence of frank herniation"; and "[m]ild bulging at L3-4." TR 290.

On December 3, 1999, Plaintiff was examined by physicians at Gateway Medical Center. TR 152-160. A pathology report, signed by Pathologist Randall R. Haase, indicated that Plaintiff had a "herniated L5 disc." TR 158. Dr. Beazley noted that a "right lumbar

laminectomy with S1 nerve root foraminotomy"[14] was performed.  TR 157.  On December 6,

1999, Dr. Beazley noted that Plaintiff "continued to have pain in his back down into his right leg

and also intermittently to the left side," and that Plaintiff was given "Tylenol for pain and a

Medrol Dosepak." TR 153.

On December 10, 1999, Plaintiff returned to Dr. Beazley's office for a follow-up

examination regarding his laminectomy.  TR 381.  Dr. Beazley noted that Plaintiff had a

"negative" straight leg raise on the left and a "mildly positive" straight leg raise on the right at

"about 55 degrees."  *Id.*  Dr. Beazley examined Plaintiff's incision and noted that Plaintiff was

given Tylox and was started on Elavil for his difficulty sleeping at night.  *Id.*

On December 22, 1999, Plaintiff returned to Dr. Beazley's office for another follow-up

examination.  TR 380.  Dr. Beazley noted that Plaintiff had "some soreness in the right leg" and

"diminishing" soreness in the left leg.  *Id.*  Plaintiff was told to continue on Celebrex and was

given Tylox.  *Id.*

On December 27, 1999, Dr. Roger C. Lind examined Plaintiff.  TR 286.  Dr. Lind noted

"mild degenerative bone spurring," and that Plaintiff's disc spaces were "well maintained and

the sacroiliac joints [were] unremarkable."  *Id.*  His impression of Plaintiff was "lumbar

degenerative spondylosis."  *Id.*

On December 28, 1999, Plaintiff returned to Dr. Beazley's office, stating that he "fell

over and re-injured his back."  TR 380.  Dr. Beazley noted that Plaintiff had a "positive straight

leg raise in both the left and right" legs.  *Id.*  Dr. Beazley noted that Plaintiff was "sore and

tender in the low back," and that Plaintiff's incision was "healing well."  *Id.*  Plaintiff was given

---

[14] A description of the procedure is provided in the record.  TR 155.

a Dosepack and Tylox.  *Id.*

On January 12, 2000, Plaintiff visited Dr. Beazley's office.  TR 379.  Nurse Stephens reported,  "[Plaintiff] [was] really not any better. ... In fact, he really [was] worse by his report." *Id.*  She noted that Plaintiff was "very sore and tender in the low back," and that he had a "positive straight leg raise on the right at 45°."  *Id.*  She opined that Plaintiff should undergo another MRI because he had fallen several times since his surgery.  *Id.*  Plaintiff was given Lortab 5.  *Id.*

On January 16, 2000, Plaintiff was seen by Dr. Randy W. Christenson at Gateway Medical Center, complaining of a backache.  TR 282.  Dr. Christenson found "mildly decreased" disc spaces at "T10-T11 and L3-4"; "large anterior spurs" at "L3-4"; and "some anterolateral spondylosis" at "L2-3 and L4-5."  *Id.*  Dr. Christenson's impressions were "degenerative disc disease at T10-11 and L3-4 with moderate anterolateral degenerative spurring at those levels" and "minor spurring at other levels, L2-3 and L4-5."  *Id.*

On January 17, 2000, Plaintiff visited Dr. Beazley's office, stating that he had fallen again.  TR 379.  Nurse Stephens noted that Plaintiff had been seen in the Emergency Room the previous night and was referred to Dr. Beazley for a follow-up examination.  *Id.*  She advised Plaintiff that it was important that he use his "walker" so that he did not continue to fall.  *Id.* Nurse Stephens noted that she gave Plaintiff Tylox, and indicated that an MRI had been scheduled.  *Id.*

On January 19, 2000, Dr. Beazley examined Plaintiff for "status post L5 laminectomy." TR 277.  Plaintiff underwent an MRI which revealed "[p]ost-op changes at L5-S1 with enhancing scar in the region"; "[a] tiny area of disc material in the right paracentral location" of

21

"L5-S1" that was "consistent with scar/fibrosis"; and "no change in the right paracentral disc bulging at L4-L5 without evidence of definite frank herniation or mild broad based bulging at L3-L4." TR 278.

On January 21, 2000, Plaintiff telephoned Dr. Beazley's office and requested pain medication. TR 378. Nurse Stephens noted that, earlier that week, she had discussed Plaintiff's pain control with him. *Id.* Nurse Stephens noted that she was going to "switch [Plaintiff] over to OxyContin," and that she advised Plaintiff "regarding the precautions and the use of this medication." *Id.*

On January 24, 2000, Plaintiff underwent a psychological evaluation conducted by examiner Cindy Brooks and signed by Dr. Denise Ann Zecca and Dr. Janice Martin. TR 161-165. Plaintiff's "Medical Assessment to do Work Related Activities" indicated that he showed "no limitation with the ability to understand and remember simple or detailed instructions"; "no limitations with concentration and ability to make work-related decisions"; and "no limitations with social interactions, and ability to maintain situation appropriate, socially acceptable behavior." TR 164. Plaintiff's assessment indicated that he did "have difficulty maintaining basic standards of hygiene and cleanliness" and "difficulty adapting to changes but [was] probably aware of normal hazards within his environment." *Id.* The "overall impression" was that Plaintiff was "markedly limited in daily functioning." *Id.* The assessment also indicated that Plaintiff's "depressed mood, frustration and irritability appear[ed] to be reactive to his present physical condition." *Id.* Plaintiff's diagnostic impressions were "Adjustment Disorder with depressed mood"; "gastrointestinal distress, back pain, numbness in [right] leg"; "psychological stressors - unemployment, severe financial problems"; and "current GAF - 40."

TR 165.

On January 31, 2000, Dr. Frank Kurstas completed a Psychiatric Review Technique Form regarding Plaintiff.[15]  TR 166-174.  Dr. Kurstas marked "RFC Assessment Necessary (i.e., a severe impairment is present which does not meet or equal a listed impairment)."  TR 166.  Dr. Kurstas noted Plaintiff's "alleged chronic back pain."  TR 167.  Dr. Kurstas indicated that Plaintiff experienced "[d]isturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by []."[16]  TR 169.  Dr. Kurstas noted that Plaintiff did not show any evidence of mental retardation and autism, anxiety related disorders, somatoform disorders, personality disorders, or substance addiction disorders.  TR 170-172.  Dr. Kurstas noted that Plaintiff experienced "moderate" restriction of activities of daily living, and "moderate" difficulties in maintaining social functioning.  TR 173.  Dr. Kurstas further noted that Plaintiff "often" experienced deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner, and "once or twice" experienced episodes of deterioration or decompensation in work or work-like settings.  *Id.*

On January 31, 2000, Dr. Kurstas also completed a Mental Residual Functional Capacity Assessment regarding Plaintiff.  TR 175-178.  Dr. Kurstas noted that Plaintiff was "moderately limited" in his "ability to carry out detailed instructions"; his "ability to maintain attention and concentration for extended periods"; his "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances"; his "ability to complete a

---

[15] Dr. Kurstas' handwritten notes are partially illegible.  TR 167.

[16] Dr. Kurstas made a handwritten notation as to what the "[d]isturbance of mood" was "evidenced by," but the notation is not readable as a result of a poor copy.

23

normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods"; his "ability to interact appropriately with the general public"; and his "ability to respond appropriately to changes in the work setting."  TR 175-176.  Dr. Kurstas noted that Plaintiff was "not significantly limited" in his "ability to remember locations and work-like procedures"; his "ability to understand and remember very short and simple instructions"; his "ability to understand and remember detailed instructions"; his "ability to carry out very short and simple instructions"; his "ability to sustain an ordinary routine without special supervision"; his "ability to work in coordination with or proximity to others without being distracted by them"; his "ability to make simple work-related decisions"; his "ability to ask simple questions or request assistance"; his "ability to accept instructions and respond appropriately to criticism from supervisors"; his "ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes"; his "ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness"; his "ability to be aware of normal hazards and take appropriate precautions"; his "ability to travel in unfamiliar places or use public transportation"; and his "ability to set realistic goals or make plans independently of others."  *Id.*

On February 1, 2000, Plaintiff visited Dr. Beazley's office for a follow-up examination. TR 377.  Nurse Stephens noted that Plaintiff's condition was "[u]nchanged from previous visit," that her impression was "[p]ersistent pain following laminectomy," and that Plaintiff was given "MS contin."  *Id.*  Nurse Stephens noted that she would order Plaintiff a "TENS" unit.  *Id.*

On February 10, 2000, Dr. Donita Keown performed a consultative examination of Plaintiff.  TR 179-189.  Dr. Keown noted that Plaintiff was ambulating with the use of a walker

24

"very slowly, moaning and groaning with each step." TR 179. Dr. Keown noted that Plaintiff complained of "wheezing and shortness of air when exposed to dusty situations or strong odors." *Id.* Dr. Keown further noted that Plaintiff's upper extremities showed "full range of motion of the shoulders, elbows, wrists, and hands"; that Plaintiff had "[i]ntact grip strength"; and that "[n]o exam of the lower extremities was permitted." TR 181. Dr. Keown reported that Plaintiff "insist[ed] that he continue[ed] to be under postop restrictions after laminectomy of 'doing nothing at all but laying in bed.'" *Id.* Dr. Keown further stated that Plaintiff was "asymptomatic with regard to any problems with the kidney and had a single episode of pancreatitis which resolved with hydration." *Id.* Dr. Keown noted that she would not estimate Plaintiff's "work expectations" upon this examination. *Id.*

On February 22, 2000, Plaintiff returned to Dr. Beazley's office for a follow-up examination. TR 377. Nurse Stephens noted that Plaintiff was "a little bit better," that the OxyContin "seem[ed]" to be relieving his pain, and that Plaintiff complained of swelling in the lower extremities. *Id.* Nurse Stephens indicated that Plaintiff would continue taking OxyContin and that he was given Robaxin for his spasms. *Id.*

On February 22, 2000, Dr. Frederic E. Cowden completed a Physical Residual Functional Capacity Assessment of Plaintiff. TR 190-197. Dr. Cowden opined that Plaintiff could "occasionally" lift and/or carry 50 pounds, and "frequently" lift and/or carry 25 pounds. TR 191. Dr. Cowden further opined that Plaintiff could sit, and stand and/or walk, for "about 6 hours in an 8-hour workday," and that Plaintiff was "unlimited" in his ability to push and/or pull. *Id.* To support his findings, Dr. Cowden noted Plaintiff's "alleged disability due to back pain, asthma,

and kidney stones."[17]  *Id.*  Dr. Cowden also opined that Plaintiff was "frequently" limited in

postural activities such as climbing, balancing, stooping, kneeling, crouching, and crawling.  TR

192.  Regarding environmental limitations, Dr. Cowden noted that Plaintiff was "unlimited" in

all categories except "fumes, odors, dusts, gases, poor ventilation, etc." for which Dr. Cowden

indicated that Plaintiff should "avoid concentrated exposure."  TR 194.

On March 7, 2000, Plaintiff visited Dr. Beazley's office for a follow-up examination.  TR

376.  Nurse Stephens noted that Plaintiff was "not any better," and that he was "complaining of

quite a bit of discomfort and pain."  *Id.*  She noted that Plaintiff had "not yet started physical

therapy" and that Plaintiff was further encouraged to begin the therapy.  *Id.*  Nurse Stephens

explained to Plaintiff that Dr. Beazley could not "keep him on Tylox forever."  *Id.*  Plaintiff was

advised to take 3 Tylox a day and was given samples of Ultram to supplement the Tylox.  *Id.*

Nurse Stephens stated: "Hopefully we can continue to decrease him out of the narcotic pain

medicine that he is taking."  *Id.*  Plaintiff was prescribed Elavil to help him sleep.  *Id.*

From March 26 through March 28, 2000, Plaintiff was examined by physicians at the

Gateway Medical Center.  TR 248-257.  Dr. Beazley noted that an MRI had been ordered and

that Plaintiff might also undergo a myelogram and a CT scan.  TR 250.  On March 26, 2000, Dr.

Kent examined Plaintiff and noted that Plaintiff was "very histrionic with much splinting, acting

as if in severe pain."  TR 251.  Dr. Kent further stated, "[Plaintiff] was very slow and deliberate

getting on the stretcher."  *Id.*  Dr. Kent's impression was "status post fall with right leg pain, rule

out sciatica."  *Id.*  In another report on March 26, 2000, Dr. Kent noted that Plaintiff was "acting

---

[17] The report contains additional handwritten notes by Dr. Cowden, but the notes are
illegible.

as if having much pain in his back with range of motion, as well as his legs." TR 252. Dr. Kent

noted that Plaintiff was "unable to perform straight leg raise secondary to [Plaintiff's]

intolerance." *Id.* Dr. Kent's impression of Plaintiff was "[c]hronic emergency room visits for

pain related conditions, rule out narcotic dependency." *Id.* On March 27, 2000, Dr. Lind

examined Plaintiff. TR 254-256. Dr. Lind's impressions of Plaintiff were "[i]nterval

development of small disc herniation laterally to the left at L3-4"; "[m]oderated unchanged

central disc bulging at L4-5 (borderline protrusion)"; "[s]mall disc protrusion centrally at L5-S1,

improved"; "[n]o significant epidural fibrosis seen"; and "post-operative changes are present at

L5-S1." TR 255-256. Dr. Beazley's discharge diagnosis of Plaintiff was "status-post

laminectomy with residual right leg pain." TR 248.

On April 8, 2000, Plaintiff was admitted to Gateway Medical Center because of "chest

pain." TR 244. Dr. Paul Cha noted that Plaintiff was admitted to "CCU via the emergency

room," and that Plaintiff was given "aspirin, nitroglycerin sublingual, nitro paste, Tylenol,

Phenergan, Lovenox subq, Lopressor IV and Lopressor p.o., and Prevacid and Tylox." TR 245.

Dr. Cha noted that Plaintiff's pain was not relieved with nitroglycerin, but was relieved after

taking Tylox. *Id.* Dr. Cha's final diagnosis of Plaintiff included "chest pain of unknown

etiology." *Id.* Plaintiff was discharged on April 9, 2000. *Id.*

On April 13, 2000, Plaintiff was again admitted to Gateway Medical Center because of

"chest pain." TR 239. Dr. David L. Gullett examined Plaintiff and noted that Plaintiff had

reported that he had not experienced "any prior chest pain until about 5 days ago when he had

the onset of anterior chest pain radiating up into the jaw through the back associated with

diaphoresis, weakness, lightheadedness and dyspnea." *Id.* Dr. Gullett's impressions of Plaintiff

were "[p]ossible angina pectoris" and "[t]achycardia, etiology uncertain." TR 240. Dr. Pradip

Mishra also examined Plaintiff and noted that his impressions of Plaintiff were "[c]hest pain

syndrome" and "[p]alpitation." TR 237-238.

On April 17, 2000, Plaintiff underwent a "NM Cardiolite Stress" examination, which

revealed "[a] small focus of slightly decreased radionuclide activity of questionable clinical

significance in the infereolateral wall about the cardiac apex. 56% resting left ventricular

ejection fraction." TR 233.

On April 19, 2000, Plaintiff returned to Dr. Beazley's office for a follow-up examination

regarding his laminectomy. TR 375. Nurse Stephens noted that Plaintiff reported "residual

pain," that she told him to continue taking OxyContin, and that she gave him an additional

prescription of OxyContin to "save his wife a trip out here ... when he [ran] out." *Id.* Nurse

Stephens further noted that Plaintiff's "therapy" was discontinued until Plaintiff could find a

consistent method of transportation. *Id.*

In a treatment note dated April 24, 2000, Dr. Mishra reported that he had performed a

"cardiac catheterization" on Plaintiff, which demonstrated "nonobstructive coronary artery

disease." TR 199. Dr. Mishra stated that Plaintiff continued to experience chest pain which, Dr.

Mishra opined, was "related to gastroesophageal reflux." *Id.* Dr. Mishra recommended Prilosec

or Prevacid for Plaintiff's condition. *Id.*

On May 1, 2000, Plaintiff was admitted to Gateway Medical Center and underwent an

appendectomy. TR 202-221. Dr. Prasad V. Gade noted that "operative findings showed a

creeping fat on the terminal ileum with some mild thickening." TR 203. Dr. Gade noted that

Plaintiff was stable and continued on "IV Unasyn" for antibiotic coverage and that he was

28

eventually given Prevacid.  *Id.*  Plaintiff was discharged on May 5, 2000, and was instructed not to do "heavy lifting or strenuous activity for 3 weeks" and "to not drive on pain medicines."  TR 204.

In a letter dated May 4, 2000, Dr. Robert R. Berberich reported that he had performed a hospital consultation on Plaintiff, that Plaintiff "seemed to be a man of generally average intelligence with intact judgement," and that his "[d]ecision making appeared to be relegated to only simple matters."  TR 200-201.  Dr. Berberich further reported that Plaintiff possessed "[s]ymptoms of depression which included a sense of despair, anhedonia, isolation, and suicidal thoughts" which were indicators of a diagnosis of "Major Depressive Disorder."  *Id.*  Dr. Berberich noted that Plaintiff chose "not to take medication," and opined that there was "an excellent chance" that Plaintiff would need medication in the "very near future."  *Id.*  Dr. Berberich indicated that Plaintiff's GAF score was "approximately 47."  *Id.*  Dr. Berberich noted that he would "continue to follow" Plaintiff for one and one-half months, "the length of time it [would] take to complete an intake assessment."  *Id.*

On May 14, 2000, Plaintiff presented to the Emergency Room with a decaying tooth that had "further broke."[18]  TR 504.  Plaintiff was diagnosed with a "fracture[d] tooth" and was given Darvocet N-100.  *Id.*  Plaintiff returned to the Emergency Room on May 20, 2000, complaining of an "excruciating tooth ache."  TR 501.  Plaintiff was diagnosed with "exacerbation [of] dental pain."  *Id.*  Plaintiff was offered 800 milligrams of Motrin, which he refused.  TR 500.  Plaintiff

---

[18] Unless otherwise noted, the term "Emergency Room" will hereinafter be used to refer to the Emergency Room at Gateway Medical Center, in Clarksville, Tennessee.

returned to the Emergency Room the following day, again complaining of dental pain.[19]  TR 499.

Plaintiff was prescribed Ultram.  *Id.*

On May 23, 2000, Plaintiff presented to the Gateway Medical Center because of a "syncopal episode and headache."  TR 493.  Plaintiff underwent a CT scan of his head and a lumbar puncture, both of which were "negative."  *Id.*  Dr. David L. Gullett assessed Plaintiff with "[s]evere headache with syncope, etiology uncertain"; "[c]hronic low back pain with sciatica"; "Crohn's disease"; and "[g]astroesophageal reflux disease."  TR 494.

On May 25, 2000, Dr. Terry Peacher examined Plaintiff for complaints of pain.[20] TR 369-371.  Dr. Peacher noted that Plaintiff was not able to sleep at night, and that he prescribed Plaintiff Seroquel and Remeron.  TR 370.

On May 30, 2000, Dr. Victor Pestrak completed a Mental Residual Functional Capacity Assessment regarding Plaintiff.  TR 347.  Dr. Pestrak noted that Plaintiff was "moderately" limited in his "ability to carry out detailed instructions"; his "ability to maintain attention and concentration for extended periods"; his "ability to work in coordination with or proximity to others without being distracted by them"; his "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods"; his "ability to interact appropriately with the general public"; his "ability to accept instructions and respond appropriately to criticism from supervisors"; and his "ability to respond appropriately to changes in the work setting."  TR 347-348.  Dr. Pestrak noted that Plaintiff was "not significantly

---

[19] This record is partially illegible.

[20] Dr. Preacher's handwritten notes are partially illegible.

limited" in his "ability to remember locations and work-like procedures"; his "ability to understand and remember very short and simple instructions"; his "ability to understand and remember detailed instructions"; his "ability to carry out very short and simple instructions"; his "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances"; his "ability to sustain an ordinary routine without special supervision"; his "ability to make simple work-related decisions"; his "ability to ask simple questions or request assistance"; his "ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes"; his "ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness"; his "ability to be aware of normal hazards and take appropriate precautions"; his "ability to travel in unfamiliar places or use public transportation"; and his "ability to set realistic goals or make plans independently of others." *Id.* Dr. Pestrak noted that Plaintiff could "carry out simple, [and] some detailed tasks." TR 349. Dr. Pestrak opined that Plaintiff's "attention and concentration" and "persistence and pace" would "be adequate." *Id.* Dr. Pestrak also opined that Plaintiff could "respond adequately to criticism" and that Plaintiff would be able to "respond adequately to changes in the work setting." *Id.*

On May 30, 2000, Dr. Pestrak also completed a Review Technique Form regarding Plaintiff. TR 351-359. Dr. Pestrak marked "RFC Assessment Necessary (i.e., a severe impairment is present which does not meet or equal a listed impairment)." TR 351. Dr. Pestrak noted that Plaintiff reported "physical problems with pain," and noted that "there was "no significant impairment."[21] TR 352. Dr. Pestrak indicated that Plaintiff experienced

---

[21] Dr. Pestrak's handwritten notes are partially illegible.

"[d]isturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by []."[22] TR 354. Dr. Pestrak noted that Plaintiff did not possess any evidence of mental retardation and autism, anxiety related disorders, somatoform disorders, personality disorders, or substance addiction disorders. TR 355-357. Dr. Pestrak further noted that Plaintiff had "moderate" difficulties in maintaining social functioning.[23] TR 358. Dr. Pestrak additionally noted that Plaintiff "often" experienced deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner, and "once or twice" experienced episodes of deterioration or decompensation in work or work-like settings. *Id.*

On May 31, 2000, Plaintiff underwent a Physical Residual Functional Capacity Assessment completed by a DDS physician.[24] TR 360-368. The physician noted that Plaintiff could "occasionally" lift and/or carry 20 pounds, and "frequently" lift and/or carry 10 pounds. TR 361. The physician opined that Plaintiff could sit, and stand and/or walk, for "about 6 hours in an 8-hour workday," and that Plaintiff was "unlimited" in his ability to push and/or pull.[25] *Id.* The physician noted that Plaintiff was "occasionally" limited with regard to postural limitations such as climbing, balancing, stooping, kneeling, crouching, and crawling. TR 362.

On June 5, 2000, Plaintiff visited the Emergency Room and complained of "[right] flank pain." TR 490. Plaintiff underwent an "IVP," which revealed that Plaintiff's kidneys were

---

[22] Dr. Pestrak made a handwritten indication as to what Plaintiff's "disturbance of mood" was "evidenced by," but that notation is illegible.

[23] For the category "Restriction of Activities of Daily Living," Dr. Pestrak placed a mark between the boxes "slight" and "moderate."

[24] The physician's name is illegible.

[25] The physician also made handwritten notes which are not illegible.

32

"normal in size and position" and showed no "contour deformities"; the "collecting systems [were] seen throughout their course bilaterally disclosing no evidence of obstruction or intraluminal filling defects"; and the "urinary bladder [was] partially filled showing on [*sic*] distinct intrinsic anomalies." TR 491.

On June 11, 2000, Plaintiff presented to the Emergency Room and complained of "[r]ight flank pain." TR 488. Dr. Stephen H. Percelay noted that "scout film" demonstrated "no definite significant abnormalities with some moderate retained focal material noted." *Id.*

On June 15, 2000, Plaintiff visited the Emergency Room because of shoulder pain. TR 483-485. Dr. Lawrence Jackowski noted that "[v]iews of the right shoulder were obtained and reveal[ed] osseous structures to be intact as visualized." TR 485. Plaintiff was diagnosed as having "right shoulder strain" and was given Darvocet N-100. TR 484.

On June 17, 2000, Plaintiff presented to the Emergency Room because of "[right] flank pain radiating to [his right] testicle" that felt "similar to previous stones." TR 481-482. The physician noted that Plaintiff had presented to the Emergency Room twice that month with "flank pain." TR 482. The physician noted that he did not believe that another "IVP and work-up" was necessary. *Id.* The following night, Plaintiff presented to the Emergency Room because of nausea and vomiting. TR 480. The physician diagnosed Plaintiff with a "headache." *Id.*

On June 21, 2000, Plaintiff returned to Dr. Peacher complaining of lack of sleep and stated that Lortab helped him sleep. TR 371. Dr. Peacher gave Plaintiff a prescription for Doxepin. *Id.*

On June 21, 2000, Plaintiff was examined by Dr. Gullett regarding his kidney stones. TR

33

589.  A "stone analysis" revealed that the fragments appeared to be "a drug."  *Id.*  Dr. Gullett's impressions were "[c]hronic back pain, etiology undetermined -- possible musculoskeletal in origin"; "S/P lumbar laminectomy with sequelae of bilateral sciatica"; "[history] of calculus disease"; "hypercalciuria"; "hyperuricosuria"; and "[history] of Crohn's disease."  TR 587.

Plaintiff telephoned Dr. Miles on two occasions on June 22, 2000, complaining of "swelling of his knees," and stating that his pain medications were "too strong." TR 587.  Dr. Miles noted that Plaintiff was told that he "would not call any more analgesics at this point in time." *Id.*

On June 24, 2000, Plaintiff presented to the Emergency Room because of "mild chest discomfort."  TR 475.  The physician diagnosed Plaintiff with "bilat[eral] lower extremity edema." *Id.*

On June 28, 2000, Plaintiff telephoned Dr. Miles from Eckerd's Drug Store and received Lortab 5. TR 587.  Dr. Miles noted that Plaintiff was told not to ask for any more pain medication.  *Id.*

On July 5, 2000, Plaintiff presented to the Emergency Room, complaining of right back and right leg pain for which Plaintiff requested pain medication.  TR 473.  The physician noted that Plaintiff had made 14 visits to the ER over the past 2 months, requesting pain medication. *Id.*

On July 10, 2000, Plaintiff presented to the Emergency Room, complaining of a toothache after chewing on ice.  TR 471.  The physician examined Plaintiff and noted that Plaintiff's teeth were in "poor repair."  *Id.*  Plaintiff was given Darvocet N-100 for his pain.  *Id.*

On July 17, 2000, Plaintiff telephoned Dr. Miles requesting more pain medication.  TR

586. Plaintiff was given Lortab 5. *Id.* The following day, Plaintiff telephoned Dr. Miles requesting "stronger" pain medication. *Id.* Plaintiff was told to contact his "PCP." *Id.*

On July 21, 2000, Plaintiff telephoned Dr. Miles stating that he had passed "a calculus" and would bring it in for analysis. TR 586. Plaintiff requested pain medication and received Lortab 5. *Id.* On July 24, 2000, Plaintiff visited Dr. Miles for analysis of "two calculi" that he had passed. *Id.* Dr. Miles scheduled Plaintiff to have a CT scan of his kidneys. *Id.* On July 30, 2000, Dr. Miles noted that Plaintiff did not undergo the scheduled CT scan. *Id.*

On August 13, 2000, Plaintiff presented to the Emergency Room complaining of a toothache. TR 465. Plaintiff stated that "something came out" while he was chewing ice. *Id.* Plaintiff was offered 800 miligrams of Ibuprofen, which he refused. TR 464.

On August 16, 2000, Plaintiff underwent an MRI of his lumbar spine. TR 461. The MRI revealed postoperative changes at "L5-S1" with "apparent epidural fibrosis, slightly." TR 462. The MRI also revealed "a small right paracentral disc protrusion or possibly a small herniation" at "L4-5," and "some mild central and left paracentral disc bulging which could potentially represent a small HNP," at "L3-4" *Id.*

On August 26, 2000, Plaintiff presented to the Emergency Room for complaints of back pain. TR 454-456. An examination of Plaintiff's lumbar spine revealed a "mild central and right paracentral disc herniation" at the "L4-L5 level." TR 456. Plaintiff's examination revealed that there was evidence of "bilateral hemilaminectomies, central and right paracentral epidural intermediate density material related to the disc, representing post-operative epidural fibrosis and/or recurrent disc herniation" at the "L5-S1 level." *Id.* Plaintiff's examination further revealed that there was "central and left paracentral bulging" at the "L3-L4 level." *Id.*

On September 2, 2000, Plaintiff presented to the Emergency Room, stating that he had "accidently" shot his right hand with a pellet gun. TR 459. An examination of Plaintiff's hand revealed that a metallic pellet was seen in the "dorsum of the hand between the third and fourth metacarpal heads." TR 460. On September 3, 2000, Plaintiff returned to the Emergency Room, complaining that the pellet was still in his hand. TR 453. The physician indicated that the pellet was retained. *Id.* The physician also indicated that there was "mild swelling" and no infection. *Id.*

In a letter dated October 3, 2000, Dr. Richard A. Berkman stated that Plaintiff had a "huge ruptured disc at L5-S1 and underwent surgery." TR 372. Dr. Berkman stated that the surgery "left [Plaintiff] with some chronic pain." *Id.* Dr. Berkman "reimaged" Plaintiff's back and reported that Plaintiff had "disc disease at L4-5" and "a pretty impressive disc at L3-4." *Id.* Dr. Berkman stated that Plaintiff had a history of "reflex sympathetic dystrophy"; "a leaky heart valve"; and "multi-level disc disease in his back." *Id.* Dr. Berkman stated, "I, therefore, think [Plaintiff] should be granted full disability." *Id.*

On October 9, 2000, Plaintiff presented to the Emergency Room for complaints of "acid pain." TR 448. A "radiology final report" revealed that Plaintiff's "bowel gas pattern [was] unremarkable with no evidence of gaseous distention." TR 451. The report also indicated that "some lumbar degenerative changes" were present. *Id.*

On December 7, 2000, Plaintiff presented to the Emergency Room, complaining of back pain as a result of falling over a foot rest. TR 441. Upon examination of Plaintiff's thoratic spine, there was evidence of "mild anterior hypertrophic changes" with "slight scoliosis." TR 442. An examination of Plaintiff's lumbar spine revealed that there was evidence of "mild

36

anterior hypertrophic degenerative changes"; that an "L4-5 " intervertebral disc space was "perhaps slightly narrowed when compared to the one above it"; and that there was evidence of "very slight scoliosis." TR 443. Plaintiff requested pain medication and was given prescriptions for Dilaudid and Flexeril. TR 441.

On December 8, 2000, Plaintiff presented to the Emergency Room complaining of back pain as a result of falling down the previous day. TR 439. The record indicated that a radiologist's reading of "T spine and TS spine" revealed that there were no fractures present. *Id.* The physician's diagnosis was "acute exacerbation of chronic back pain." *Id.*

On December 19, 2000, Plaintiff presented to the Emergency Room, stating that he had tripped over a pair of pajamas, landed on his daughter's book, and "could not move" because of pain.[26] TR 436. Plaintiff underwent an examination of his lumbar spine, which revealed "mild hypertrophic degenerative changes throughout"; "early change in the appearance of the intervertebral disc space at 4-5"; and "no evidence of fracture or subluxation, no evidence of spondylolysis or spondylolisthesis." TR 437. Plaintiff also underwent an examination of his cervical spine, which revealed that "[v]ertebral foramina [were] widely patent"; that there were "anterior hypertrophic degenerative changes"; that there was "slight narrowing of the 5-6 intervertabral disc space"; and that there was "no evidence of fracture or subluxation." *Id.* The physician's overall impression was: "No evidence of injury. Mild degenerative changes." *Id.*

In a letter dated January 2, 2001, Dr. Beazley stated that Plaintiff had "some significant medical restrictions including lifting no more than about 20 pounds, no repetitive squatting or stooping." TR 374. Dr. Beazley noted that Plaintiff could probably walk "about 100-200 feet

---

[26] The physician's handwritten notes are partially illegible.

37

before sitting down to rest." *Id.* Dr. Beazley further noted that Plaintiff would "have an impairment of 10% of the body as a whole based on the AMA Guides status post laminectomy with residual pain." *Id.*

In a letter to Dr. Gullet, dated February 2, 2001, Dr. Berkman reported that Plaintiff was "miserable with pain." TR 518. Dr. Berkman opined that he did not believe that the "L4-5 level explain[ed] all of his pain." *Id.* Dr. Berkman stated that he would like to have Plaintiff undergo a "discogram at L3-4, L4-5, and L5-S1." *Id.* Dr. Berkman noted that Plaintiff was placed on OxyContin 20 milligrams to help relieve Plaintiff's pain. *Id.* Dr. Berkman noted that he may consider recommending a "dorsal column stimulator" or an "implanted Morphine pump." *Id.*

On February 11, 2001, Plaintiff presented to the Emergency Room, stating that he had "slipped on a wet floor." TR 433. A "radiology final report" revealed "[n]o significant change" of Plaintiff's "PA" and "lateral chest." TR 434.

On February 17, 2001, Plaintiff presented to the Emergency Room because he had accidentally shot his left hand with a "$CO_2$ gun." TR 430. A "radiology final report" indicated that "evidence of a metallic foreign body" was seen within "the soft tissues near the dorsal and lateral aspect of the left hand." TR 431.

A Gateway Medical Center discharge summary indicated that Plaintiff was admitted on February 27, 2001 because of "cough and dyspnea" and that Plaintiff was discharged on March 4, 2001. TR 402-403. Plaintiff underwent a chest x-ray which revealed: "no acute disease, probable chronic obstructive pulmonary disease." TR 402. Plaintiff also underwent a "VQ lung scan" which revealed, "low probability for pulmonary emboli, high probability for pulmonary emphysema." *Id.* Dr. Gullett noted his final diagnoses to be "[e]xacerbation of chronic

38

obstructive pulmonary disease"; "[b]ronchitis with hypoxemia"; and "[a]nemia, etiology uncertain." TR 403.

In a letter to Dr. Gullett, dated March 6, 2001, Dr. Berkman reported that Plaintiff "remain[ed] miserable with pain." TR 517. Dr. Berkman noted that Plaintiff had "very severe degeneration" at the "L4-5" and "L5-S1" discs. *Id.* Dr. Berkman stated that there was "really nothing else to offer [Plaintiff] but surgery." *Id.*

On April 20, 2001, Plaintiff presented to the Emergency Room, complaining of "[right] flank pain." TR 425. Plaintiff was given Dilaudid while in the Emergency Room and Darvocet N-100 upon discharge.[27] TR 424-425.

On April 29, 2001, Plaintiff presented to the Emergency Room, complaining of back pain as a result of falling the previous day. TR 423. The physician diagnosed Plaintiff with "acute exacerbation of chronic back pain." *Id.* Plaintiff was prescribed Lortab 5. *Id.*

On May 15, 2001, Dr. Miles examined Plaintiff for complaints of "gross hematuria" and "right flank discomfort." TR 583. Dr. Miles noted Plaintiff's history of calculus disease, hypercalciuria, hyperuricosuria, and Crohn's disease. TR 584. Dr. Miles also noted that Plaintiff would undergo a cystoscopy upon his next visit. *Id.* On May 17, 2001, Plaintiff telephoned Dr. Miles' office to cancel his scheduled examination and to reschedule his appointment. TR 582. On May 21, 2001, Plaintiff again telephoned Dr. Miles' office to cancel his scheduled examination. *Id.* On May 24, 2001, Plaintiff requested and was denied pain medication from Dr. Miles. *Id.*

---

[27] Plaintiff was prescribed other medications, but the physician's handwriting is not legible.

On June 9, 2001, Plaintiff presented in a wheelchair to the Emergency Room, complaining of back pain and sore shoulders. TR 421. Plaintiff was diagnosed with "chronic lumbar pain" and was given a prescription for Lortab 5. *Id.*

On June 14, 2001, Plaintiff was admitted to Saint Thomas Hospital and underwent a hemilaminectomy, medial facetectomy, and foraminotomy, performed by Dr. Berkman. TR 505. Plaintiff's discharge diagnosis was: "[l]umbar disk disease with degenerative disk disease at L4/5 and L5 S1 [*sic*]." *Id.* Plaintiff was prescribed Lortab 10, Valium, and Halcion. TR 506.

In a letter dated June 14, 2001, Dr. Berkman reported that Plaintiff's surgery had "gone beautifully." TR 515. Dr. Berkman noted that Plaintiff's "L5 nerve roots were huge and getting compressed quite a bit by bony overgrowth," and that he "fused the disc spaces and placed pedicle screws." *Id.* Dr. Berkman stated that he was "hopeful" that the surgery would "help" Plaintiff, and opined that Plaintiff would undergo "a long recovery." *Id.*

In a letter to Dr. Gullett, dated July 17, 2001, Dr. Berkman reported that Plaintiff was "very sore from his surgery." TR 514. Dr. Berkman wrote that "this gentleman is never going to be able to return to work." *Id.* Dr. Berkman stated that his "main goal" was to relieve Plaintiff's pain, and further stated that Plaintiff was taking "stronger pain pills that seem to be helping." *Id.*

In another letter dated July 17, 2001, Dr. Berkman noted that Plaintiff had been under his care for "almost one year," and that Plaintiff suffered from "low back pain." TR 513. Dr. Berkman noted that he had recently conducted a "two-level spine fusion on [Plaintiff] from L4 to the sacrum for severe degenerative disk disease." *Id.* Dr. Berkman opined that Plaintiff was "totally disabled and [would] not be able to return to any gainful employment." *Id.* Dr. Berkman noted that Plaintiff had "ventral osteophytes and degenerative disk disease at L3-4, L2-

40

3, and L1-2." *Id.* Dr. Berkman noted that Plaintiff's "entire lumbar spine" showed evidence of "osteophyte formation, degenerative disk disease, and fusion." *Id.* Dr. Berkman further noted that Plaintiff had "a relative kyphosis at the L3-4 level." *Id.* Dr. Berkman opined that Plaintiff "[would] have chronic back pain and [would] not be able to work in a standing position for any length of time and [would] not be able to take a job that requires him to sit." *Id.*

In a letter dated July 31, 2001, Dr. Berkman noted that Plaintiff was "only six weeks post-op," and indicated that he "would not be able to make any assessment of [Plaintiff's] ability to return to work until he [was] six months post-op." TR 512.

On September 21, 2001, Plaintiff was admitted to Saint Thomas Hospital after having a seizure. TR 543-545. Plaintiff was discharged on September 27, 2001. *Id.* In the discharge summary, Dr. James Snyder noted that on the day of admission, Plaintiff was found "somnolent and probably hypoxic" at his home. TR 543. Dr. Snyder also noted that Plaintiff was found to have two Fentanyl patches in place after being prescribed only one Fentanyl patch. *Id.* Plaintiff underwent a lumbar puncture which revealed: "slight increase in protein and white blood cell count consistent with post-seizure status." *Id.* Plaintiff also underwent a CT scan, MRI, and cerebral arteriogram collectively which showed, "cerebellar infarct about 1 cm in the vermis, associated with arteriovenous malformation." *Id.* Dr. Snyder noted that Plaintiff had not complained of back pain since his admission and recommended that Plaintiff should not be given further "opioid medications" for complaints of back pain. TR 544. Dr. Snyder noted that Plaintiff complained of depression and that he would begin Plaintiff on an antidepressant upon Plaintiff's discharge. *Id.* Dr. Snyder noted Plaintiff's "narcotic dependence" and stated that he was "currently detoxified." *Id.*

41

On September 21, 2001, Dr. Samuel F. Hunter examined Plaintiff for "status epilepticus." TR 540-542. Dr. Hunter noted that Plaintiff was a "known abuser of narcotic medication." TR 540. Dr. Hunter noted that Dr. Berkman had sent Plaintiff to a pain control specialist who "discontinued" Plaintiff's "oral narcotics." *Id.* Dr. Hunter noted, however, that the specialist gave Plaintiff Fentanyl patches at 100 milligrams and that Plaintiff began using two patches at the same time. *Id.* Plaintiff underwent a CT scan which revealed an "approximately 1 cm. lesion in the cerebellar vermis rostrally and mild brain atrophy." *Id.* Dr. Hunter's impressions were "Status epilepticus. Very likely he had a Fentanyl overdose and this decreased his seizure threshold and he had seizures due to the Narcan administration."; "[c]erebellar vermis lesion"; and "[n]arcotic dependence." TR 541.

On October 23, 2001, an electroencephalogram ordered by Dr. Hunter revealed "evidence of normalization" which "may in part be due to therapeutic Dilantin levels." TR 537. Dr. Hunter noted that the "prior multifocal and widespread discharges which were seen on [September 21, 2001]" were then absent. *Id.*

On November 7, 2001, Dr. Hunter completed a Medical Assessment to do Work-Related Activities (Physical) of Plaintiff. TR 523-525. Dr. Hunter indicated that Plaintiff's "maximum weight" that he could "occasionally" lift and/or carry was less than 10 pounds. TR 523. Dr. Hunter also indicated that Plaintiff's ability to stand/walk was affected by his impairment, however, Dr. Hunter did not provide a specific estimate of Plaintiff's ability. TR 524. Dr. Hunter indicated that Plaintiff could sit for a total of 4 hours in an 8-hour workday, and stated that Plaintiff needed to change positions "frequently." *Id.* Dr. Hunter indicated that Plaintiff could "never" perform postural activities such as climbing, balancing, stooping, crouching,

42

kneeling, and crawling. *Id.* Dr. Hunter further indicated that Plaintiff's impairment affected

physical activities such as reaching, handling, feeling, and pushing/pulling. TR 525. Dr. Hunter

indicated that Plaintiff's impairment did not affect physical functions such as seeing, hearing,

and speaking, but that Plaintiff did have environmental restrictions with regard to working

around heights and moving machinery. *Id.* To support his findings, Dr. Hunter noted Plaintiff's

back pain, lumbar problems, and ataxia. TR 523-525.

On November 9, 2001, Plaintiff underwent another Medical Assessment to do Work-

Related Activities (Physical).[28] TR 578-580. The examiner indicated that Plaintiff's ability to

lift and/or carry was affected by his impairment, but the examiner did not indicate any specific

limitations except for what appears to be a notation that Plaintiff could lift and/or carry less than

10 pounds. TR 578. The examiner indicated that Plaintiff's ability to stand and/or walk was

affected by his impairment, but the examiner did not indicate any specific limitations except

what appears to be a notation that Plaintiff could stand and/or walk for less than 2 hours. TR

579. The examiner indicated that Plaintiff's ability to sit was affected by his impairment, but

again, the examiner did not indicate any specific limitations except what appears to be a notation

that Plaintiff could sit for less than 2 hours. *Id.* The examiner indicated that Plaintiff could

"never" perform postural limitations such as climbing, balancing, stooping, crouching, kneeling,

and crawling. *Id.* The examiner indicated that Plaintiff's impairment did not affect physical

functions such as reaching, handling, feeling, seeing, hearing, and speaking. *Id.* The examiner

did not indicate Plaintiff's ability to push and/or pull. TR 580. The examiner indicated that

Plaintiff had environmental restrictions regarding moving machinery and working around

---

[28] The physician's name is illegible.

vibrations, but did not indicate whether Plaintiff had limitations regarding "heights." *Id.*

### B. Plaintiff's Testimony

Plaintiff appeared, but did not testify at his hearing because of a recent stroke that had occurred approximately 2 months before the hearing. TR 608-609. During the proceedings, Plaintiff acknowledged that he had undergone carpal tunnel surgery on his right arm (TR 618) and reported that a particular medication that he had taken was an antibiotic. TR 619.

### C. Testimony of Ms. Cathy Akridge, Plaintiff's Wife

Ms. Cathy Akridge, Plaintiff's wife, testified at Plaintiff's hearing. TR 610-620.

Ms. Akridge testified that Plaintiff had previously worked as a "housekeeper," and that Plaintiff's responsibilities had included "mopping, buffing, running a buffer, and keeping the floors clean." TR 610. Ms. Akridge stated that Plaintiff's only training involved an orientation regarding the operation of the "buffer." TR 611.

Ms. Akridge testified that Plaintiff had previously worked for New Era Industries, operating a machine that placed the "spiral on cookware;" for JFB Manufacturing, making "wire harnesses;" and working as a truck driver for Hagen. TR 611.

When asked what Plaintiff's daily activities were prior to his first back surgery in 1999, Ms Akridge responded, "Not really very much." TR 612. Ms. Akridge stated that Plaintiff was "in a whole lot of pain," and that he "laid around," watched television, and went to doctor's appointments. *Id.* Ms. Akridge stated that Plaintiff would have back pain and would not work for periods of time until his pain receded and he could return to work. *Id.*

When asked what Plaintiff's daily activities were when he was not having "back problems," Ms. Akridge responded: "He was fairly active." TR 612. Ms. Akridge testified that

44

Plaintiff would engage in activities such as playing chess, working on cars, and rebuilding motors when he was not in pain. *Id.*

Plaintiff's attorney asked Ms. Akridge to explain what had happened in 1999 "that really brought on [Plaintiff's] downfall to this point." TR 613. Ms. Akridge testified that Plaintiff had sneezed while he was bent over which caused him to "[blow] out the two discs" and lose bladder control as a result of swelling of the discs. *Id.* Ms. Akridge testified that Plaintiff had back surgery in 1999 and that "just enough" of the disc matter was removed to relieve the pressure and regain bladder control. *Id.*

When asked to discuss Plaintiff's state regarding "pain and functioning" after the surgery, Ms. Akridge stated, "He ain't been right since." TR 613-614. Ms. Akridge stated, "[Plaintiff] doesn't do anything. He's always in constant pain." *Id.* Ms. Akridge stated that Plaintiff needed assistance getting to the bathroom and getting dressed, and that Plaintiff could not bend or stand up from a seated position. *Id.* Ms. Akridge stated that Plaintiff's condition worsened over time after his surgery and that, since 2001, he needed to use a "walker" or "walking stick" to get around. *Id.*

Ms. Akridge testified that Plaintiff also had Crohn's disease and kidney problems which were not causing him problems at that time. TR 615. Ms. Akridge testified that Plaintiff additionally had problems with the fluctuation of his blood pressure as a result of a stroke. TR 616. Ms. Akridge reported that Plaintiff became "confused a lot," and that the condition of his memory varied since his stroke. TR 617. Ms. Akridge testified that Plaintiff had seizures, that Plaintiff's vision was impaired, that Plaintiff could not write, and that the doctors told her that Plaintiff could not "be left alone." *Id.* Ms. Akridge stated that Plaintiff was on "antiseizure"

medications such as Dilantin and Capra, and that "confusion" could be a side effect of Dilantin
*Id.*

Ms. Akridge stated that Plaintiff had not been able to help with household chores since he started having back pain.  TR 618.  Ms. Akridge testified that Plaintiff was a right-handed person and had undergone carpal tunnel surgery on his right arm.  TR 618-619.  Ms. Akridge testified that Plaintiff could not drive because of his problems with seizures and confusion.  TR 619.

When asked which medications Plaintiff was then taking, Ms. Akridge responded by spelling the name of a medication for Plaintiff's kidneys.  TR 619.  Plaintiff interjected that it was an antibiotic.  *Id.*  The ALJ then listed Plaintiff's medications and asked Ms. Akridge whether Plaintiff was taking any "narcotic medication."  TR 620.  Ms. Akridge responded that Plaintiff was not taking any narcotic medication and that he had ceased taking such medication after his stroke.  *Id.*

### D.  Vocational Testimony

Vocational Expert ("VE"), Dr. Gordon Doss, also testified at Plaintiff's hearing.  TR 620-627.

The VE testified that Plaintiff's most recent job as a truck driver was considered "medium and semiskilled" work; that his job as an "assembler and set-up man for JFB Manufacturing" was considered "light and semiskilled" work; that his job as a "machine operator at New Era" was considered "light and unskilled" work; and that his job as a "housekeeper or custodian at Clarksville Nursing Home" was considered "medium and unskilled" work.  TR 620-621.  The VE testified that Plaintiff's skills as an assembler would transfer to a "sedentary assembly job," and that Plaintiff's truck-driving skills would not transfer

46

to any "lighter level." *Id.*

The ALJ presented the VE with a hypothetical situation assuming an individual that was a "younger individual with a high school education and ... medically determinable impairments that may affect the capacity to function." TR 621-622. Particularly, the ALJ asked the VE to consider the capabilities of an individual as described in a DDS consultant's evaluation in Exhibit 9F. *Id.* The VE testified that the evaluation described an individual capable of performing "most medium, light and sedentary work." TR 622. The VE testified that an individual with such capabilities could perform the work of the "truck-driving job and the custodian job." *Id.* The VE further testified that a person with such capabilities could not perform the work of a "machine operator or a hardness [*sic*] assembler" because constant postural activities were required for such jobs. *Id.*

The ALJ asked the VE to consider further evidence from a DDS consultant's evaluation in Exhibit 16F. TR 622. The VE testified that such an individual was capable of "a limited range of light and sedentary work" which would preclude performing any of Plaintiff's previous work. TR 622-623.

The ALJ asked the VE whether there was any work available to an individual as described in the evaluation in Exhibit 16F. TR 623. The VE testified that such an individual could work as a "security guard at the unskilled entry level," and that there were 6,020 positions available.[29] *Id.* The VE testified that such an individual could also work as a "messenger

---

[29] The VE did not indicate whether this number was representative of the national economy or the Tennessee economy.

47

driving small packages around," and that there were 2,283 positions available.[30] *Id.* The VE
further testified that such an individual could work as a "mail clerk at the light level," which
would allow the individual to work for the "postal service" or in a "business or plant of some
kind, sorting levels, run them through the postage machine, getting them ready to send out." *Id.*
The VE stated that there were 2,955 mail clerk positions available in the Tennessee economy.
*Id.*

      The ALJ asked the VE to consider the assessments in Exhibits 25F and 26F. TR 624.
The VE testified that an individual as described in the assessments would be "unable to work."
*Id.*

      The ALJ asked the VE to consider an individual who was limited to lifting 10 pounds;
limited to standing and walking no more than 2 hours a day; and limited to sitting 6 hours a day.
TR 624. The ALJ further hypothesized that the individual "would have the opportunity to
change positions to relieve discomfort," and would have to "avoid repetitive waist motion
activities." *Id.* The VE testified that "about 25 percent of the unskilled security guard jobs
would be available for such a person," which would leave "about 1,500" positions available. TR
624-625. The VE also testified that such an individual would be able to work as an "order clerk
at the unskilled entry level," and that there were "about 989" positions available "statewide."
TR 625. The VE additionally testified that such an individual would be able to work as a
"telemarketer," that there were 2,400 positions available at the "sedentary" level, and that the
telemarketer position would allow an individual "to stand up when they need to relax

---

     [30] The VE, again, did not indicate whether this number was representative of the national
economy or the Tennessee economy.

themselves." *Id.*

The ALJ asked the VE to consider an individual that possessed an "element of pain that may be the result of impairments," which caused a "decline in the ability to maintain persistence, pace, and perhaps concentration," which would "endure for periods of time greater than normal work breaks." TR 625. The VE testified that the description of such an individual involved "marked or severe" pain, and that such an individual would be prevented from performing "any work." TR 626.

The ALJ asked the VE to consider an individual with the limitations noted in a psychological evaluation conducted in January 2000 (Exhibit 5F). TR 626. The VE testified that the evaluation listed a "global assessment of 40, which puts a person out of the work force." *Id.*

The ALJ asked the VE to consider an individual with the limitations described by a DDS consultant in Exhibit 14F. TR 626. The VE stated that he did not have the record, at which time the ALJ provided him the document for review. *Id.* The VE testified that the "moderate limitations" listed in the evaluation "would not significantly impair a person's ability to do repetitive-type, unskilled, [or] some semiskilled-type jobs." *Id.* The VE testified that an individual with these limitations would be able to perform all of Plaintiff's previous work. *Id.*

### III. CONCLUSIONS OF LAW

#### A. Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to

49

support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). If the Commissioner did not consider the record as a whole, however, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to 4 types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

## B.  Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied.  42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a 5-step sequential evaluation process as follows:

> (1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
>
> (3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[31] or its equivalent.  If a listing is met or equaled, benefits are owing without further inquiry.
>
> (4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition

_____

[31]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

51

that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5) Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added). *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.* In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

## C.  Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ erred: 1) by failing to accord controlling weight to the opinions of Plaintiff's treating physicians, 2) by disregarding Plaintiff's psychological limitations, 3) by according great weight to a consultative evaluation, and 4) by failing to take into account the combined effect of Plaintiff's impairments.[32]  Docket Entry No. 22. Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed, or in the alternative, remanded for further proceedings.  *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking."  *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).  Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits.  *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994).  *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

## 1.  Weight Accorded to the Opinions of Plaintiff's Treating Physicians

Plaintiff argues that the ALJ erred by according greater weight to a consultative

---

[32]Because Plaintiff's first and third statements in error are so closely related, the Court will discuss them together below.

examination than to the medical opinions of his treating physicians, Dr. Beazley and Dr.

Berkman.  Docket Entry No. 22.

With regard to the evaluation of medical evidence, the Code of Federal Regulations

states:

> Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> (1)  Examining relationship.  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>
> (2) Treatment relationship.  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques *and is not inconsistent with the other substantial evidence in your case record*, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. ...
>
> (3) Supportability.  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion. ...
>
> (4) Consistency.  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.
>
> (5) Specialization.  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.
>
> ...

20 C.F.R. § 416.927(d) (emphasis added).  *See also* 20 C.F.R. § 404.1527(d).

If the ALJ rejects the opinion of a treating source, he is required to articulate some basis

for rejecting the opinion.  *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).  The Code of

Federal Regulations defines a "treating source" as:

> [Y]our own physician, psychologist, or other acceptable medical
> source who provides you or has provided you, with medical
> treatment or evaluation and who has, or has had, an ongoing
> treatment relationship with you.

20 C.F.R. § 404.1502.

In his decision, the ALJ noted that Dr. Berkman had prepared a letter, dated July 17,

2001, stating that Plaintiff was "totally disabled," and that "Plaintiff would not be able to work in

a standing position for any length of time and would not be able to take a job that required him to

sit" because of "chronic back pain."  TR 22.  The ALJ further noted that Dr. Berkman indicated

his support for Plaintiff's disability claim.  *Id.*  The ALJ, however, articulated that "the probative

value of Dr. Berkman's assessment" was "lessened by a letter he wrote two weeks later, on July

31, 2001, to [Plaintiff's] attorney, in which he indicated that he would be unable to make any

assessment of [Plaintiff's] ability to return to work until six months after surgery."  TR 512.

Dr. Berkman's July 17, 2001, assessment of Plaintiff, therefore, contradicted the

assessment that he gave Plaintiff's attorney on July 31, 2001.

As the Regulations state, the ALJ is not required to give controlling weight to a treating

physician's evaluation when that evaluation is inconsistent with other substantial evidence in the

record.  *See* 20 C.F.R. § 416.927(d)(2) and 20 C.F.R. § 404.1527(d)(2).  Instead, when there is

contradictory evidence, the treating physician's opinion is weighed against the contradictory

evidence under the criteria listed above.  *Id.*  In the instant case, the ALJ clearly articulated his

reasons for discounting Dr. Berkman's opinion by indicating that the conflicting substantial

evidence lessened the "probative value of Dr. Berkman's assessment."  TR 22.  Accordingly,

Plaintiff's argument, that the ALJ erroneously disregarded Dr. Berkman's medical opinion, fails.

In his decision, the ALJ discussed Dr. Beazley's opinions and assessments regarding Plaintiff's medical condition. TR 15-18; 21. In particular, the ALJ noted Plaintiff's complaints of pain to Dr. Beazley and administration of pain medication by Dr. Beazley from May 14, 1999 through April 19, 2000. TR 15-18. The ALJ considered the opinions of Dr. Beazley and the record as a whole. TR 12-29. The ALJ concluded that the state agency medical assessments, conducted in May 2000, were objective and credible in light of the entire record because they took into account Plaintiff's "drug seeking behavior" and "back condition." TR 26-27. Because the ALJ considered the state agency medical assessments to be more credible after considering the entire record, the ALJ accorded those assessments greater weight. *Id.* This is within his province.

Plaintiff contends that the ALJ erred by according greater weight to a consultative evaluation of Plaintiff's residual functional capacity, performed by a DDS physician, than to the opinions of Dr. Berkman and Dr. Beazley. Docket Entry No. 22. Plaintiff further contends that the ALJ failed to explain "how he disregards the two (2) treating physicians assessments and adopts a consultive." *Id.* As stated above, the ALJ accorded less weight to the opinions of Dr. Berkman and Dr. Beazley because of conflicting substantial evidence and inconsistencies within the record as a whole, a judgment that is within the ALJ's province.

Plaintiff argues that the ALJ erred by failing to explain "how" he disregarded the assessments of Plaintiff's physicians and adopted the assessment of the DDS physician. Docket Entry No. 22. The Regulations, however, simply require that the ALJ state "the findings of fact and the reasons for the decision." 20 C.F.R. § 416.1453(a). As the Sixth Circuit has noted, "[t]o

56

require a more elaborate articulation of the ALJ's thought processes would not be reasonable."
*Gooch v. Secretary,* 833 F.2d 589, 592 (6th Cir. 1987). The ALJ complied with the regulation; he specifically articulated his findings of fact, and, using the information in the record, provided the rationale for his decision. TR 12-29. Accordingly, Plaintiff's argument fails.

## 2. Psychological Limitations

Plaintiff contends that the ALJ "disregard[ed]" the psychological limitations of Plaintiff. Docket Entry No. 22. Particularly, Plaintiff contends that the ALJ improperly "discredit[ed]" the psychological assessments by Drs. Zecca and Berberich by stating that they "did not have the benefit of the entire record which would have revealed [Plaintiff's] manipulative [drug] seeking behavior and would have detracted from his credibility." Docket Entry No. 22.

Dr. Zecca's records indicate Plaintiff's medical history, as well as the results of a mental status examination performed by Dr. Zecca and Dr. Zecca's assessment of Plaintiff's ability to perform work-related activities. TR 161-165. Dr. Zecca does not indicate that she consulted an outside medical source other than Plaintiff himself. *Id.* Dr. Berberich's records indicate that he interviewed Plaintiff and, based on this interview, assigned Plaintiff a GAF score and discussed Plaintiff's potential psychological limitations. TR 200-201. Dr. Berberich does not indicate that he consulted an outside medical source other than Plaintiff himself. *Id.*

The ALJ did, as Plaintiff claimed, state the abovementioned as a reason for according less weight to the assessments of Dr. Zecca and Dr. Berberich. TR 26. The ALJ, however, further noted his reasoning:

57

> The short period of time [Plaintiff] was followed by a psychiatrist suggests that he was more interested in obtaining pain medication than mental health treatment. When the pain medication was not forthcoming, he did not continue treatment. Rather than being an indication of a mental impairment involving substance abuse, the drug-seeking bahavior of the claimant demonstrates that he is capable of feigning injury and /or exaggerating pain in order to obtain narcotics.

TR 26. The ALJ continued to note that Dr. Pestrak, in an assessment conducted on May 30, 2000, "reviewed the documentary evidence ... including evidence of drug seeking behavior, and concluded that [Plaintiff] has no more than moderate limitations related to an adjustment disorder with depressed mood." TR 26. The ALJ considered this assessment to be "reasonable in light of the entire record, including the lack of persistent mental health treatment and [Plaintiff's] chronic drug seeking behavior," and therefore accorded it "great weight." *Id.*

Although the conflicting evidence could support a different conclusion, the ALJ considered the entire record and found that the medical assessment conducted on May 30, 2000, was more credible and should be accorded "great weight." TR 26. The ALJ's inferences and conclusion was properly supported by "substantial evidence," and the ALJ clearly articulated his rationale for reaching the conclusion that he did. The ALJ's decision, therefore, must stand.

### 3. Combined Effect of Plaintiff's Impairments

Plaintiff contends that the ALJ failed to properly evaluate the combined effect of his impairments. Docket Entry No. 22.

Plaintiff correctly asserts that the ALJ must evaluate the combined effect of his impairments. 42 U.S.C. § 423(d)(2)(B). Plaintiff, however, fails to show that the ALJ did not do so. Instead, Plaintiff simply maintains that the ALJ failed to "take into affect the cumulative affects [*sic*]" of Plaintiff's ailments. Docket Entry No. 22.

58

The ALJ, after evaluating all of the medical, vocational, and testimonial evidence, determined that Plaintiff did not have an impairment or combination of impairments that met or equaled a listing. TR 28. In making this determination, the ALJ specifically noted, *inter alia*, that, "though [Plaintiff] does have a significant back condition, his complaints of pain are not supported by objective evidence and are not credible in light of his drug-seeking behavior." TR 27. The ALJ also noted that Plaintiff "has 'severe' impairments, including degenerative disc disease of the lumbar spine, status post multiple back surgeries, aortic valve regurgitation, and an adjustment disorder with depressed mood." TR 28. The rationale in the ALJ's decision specifically addresses the medical evidence, and clearly indicates that these impairments were considered. TR 13-29. There is no evidence to support Plaintiff's claim that the ALJ failed to consider the combined effects of Plaintiff's ailments. To the contrary, it is clear from the ALJ's articulated rationale that the ALJ considered the record as a whole in evaluating the combined effect of Plaintiff's impairments.

Moreover, the ALJ's determination that Plaintiff did not have an impairment or combination of impairments that met or equaled a listing is supported by state agency assessments, conducted in May 2000, which concluded that Plaintiff had "no more than moderate psychological limitations"; that Plaintiff could perform "light work, with occasional lifting of up to 20 pounds, 10 pounds frequently, and with sitting, standing/walking for about 6 hours of an 8 hour workday"; and that Plaintiff was limited to "occasional climbing, balancing, stooping, kneeling, crouching, and crawling." TR 26-27. The ALJ noted that Plaintiff could not perform a "full range of light work," and he included this fact in the hypothetical posed to the VE who testified that there were jobs available to Plaintiff. TR 28.

Case 3:02-cv-00552   Document 29   Filed 04/17/06   Page 59 of 60 PageID #: 62

There is substantial evidence in the record to support the ALJ's determination that Plaintiff did not have an impairment or combination of impairments that met or equaled a listing; the ALJ's decision, therefore, must stand.

## IV.  RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgement on the Administrative Record be DENIED and Defendant's Motion for Judgment on the Administrative Record be GRANTED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied,* 474 U.S. 1111 (1986).

_____
E. CLIFTON KNOWLES
United States Magistrate Judge